## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) Case No. 13-CR-28-JED |
| DONYALE STANCLE, | ) |
| | ) |
| **Defendant.** | ) |

### OPINION AND ORDER

The Court has for its consideration defendant's First Motion to Suppress evidence from October 21, 2013 (Doc. 1796) and defendant's Second Motion to Suppress evidence from February 5, 2013 (Doc. 1797). The government has opposed both motions. (Docs. 1813, 1814). On April 15, 2016, the Court held an evidentiary hearing on the motions. The following Tulsa Police Department officers testified on behalf of the government: Corporal Adam Dawson, Corporal William Howard Jenkins, Corporal Ian Adair, Detective James Bohanon, and Officer Tyler Turnbough. At the time of the events underlying both of defendant's motions, all the officers were assigned to the Organized Gang Unit in the Special Investigations Division. Defendant called no witnesses to testify at the hearing.

**I.     Background**

This is a complex case involving, at its peak, 53 defendants. A severance plan was implemented and Mr. Stancle was one of six defendants placed in Severance Group F. (Doc. 868). Now, Mr. Stancle is the only defendant remaining in this group.

Defendant is charged in Count One of the Sixth Superseding Indictment with Conspiracy to Possess with Intent to Distribute, Distribution and to Manufacture 280 grams or more of a

detectable amount of cocaine base "crack" in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), and 846. Count one alleges as an object of the conspiracy, Possession with Intent to Distribute and Distribution of 100 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vii). Count one also alleges as an object of the conspiracy, Possession with Intent to Distribute and Distribution of 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii).

## II. Facts

### A. First Motion to Suppress

The government presented the uncontroverted testimony of Officers Turnbough and Bohanon to relay the events from October 21, 2013. The Court finds no reason to question the officers' credibility, as both appeared truthful and their sworn testimony was consistent and detailed regarding the initiation of a traffic stop, the subsequent search of defendant and another individual, as well as the search of the vehicle. Their testimony was as follows:

On October 21, 2013 at around 2:30 p.m., Officers Turnbough and Bohanon were on patrol in the area of 500 E. Tecumseh Street in Tulsa. Both officers testified that while on patrol, they received a call from a surveillance unit with a request to stop a particular vehicle.[1] The officers located the vehicle in question, which they began to follow. The officers initiated a traffic stop after they both observed the driver fail to signal a right hand turn.

Officer Bohanon approached the vehicle from the passenger's side and Officer Turnbough approached from the driver's side. Both officers testified that they smelled burnt marijuana coming from the open windows as they approached the vehicle. The officers removed

---

[1] The officers testified that it is common to receive requests to stop vehicles under surveillance, but that it is understood that they have to develop their own probable cause in order to stop the vehicle. The officers further testified that it is very common in these situations to ultimately fail to observe a traffic violation, in which case they are unable to initiate a traffic stop at that time.

the defendant, who was the driver of the vehicle, and the passenger, Demarcus Johnson, from the vehicle and handcuffed them. Officer Bohanon testified that the occupants were detained to preserve evidence. Officer Bohanon remained with defendant and Mr. Johnson while Officer Turnbough conducted a records check and ultimately found an outstanding misdemeanor warrant for Mr. Johnson.

Officer Turnbough testified that he searched the vehicle and found no marijuana. He later searched defendant and did not find any marijuana on defendant's person. There was also no marijuana found on Mr. Johnson. Officer Bohanon explained that the odor of burnt marijuana "lingers," by attaching itself to a vehicle and an individual's clothing, and thus it was not surprising that the officers were unable to find any burnt marijuana.

However, Officer Turnbough found $940 in cash in defendant's back left pocket, which consisted of four $100 bills and the rest in $20 bills. Defendant was released after the officers terminated the traffic stop, and the cash was returned to his possession. Mr. Johnson was taken into custody and arrested for his warrant. The officers testified that they exercised their discretion in deciding not to issue defendant a citation for the traffic violation.

Officer Turnbough reported and testified that the purpose of the stop and resulting Field Interview Report was to document the association between Mr. Johnson and defendant, and their presence in the area where surveillance was being conducted by law enforcement.

### B. Second Motion to Suppress

At the hearing, the government offered the testimony of Officers Dawson, Jenkins, Adair, and Bohanon. The Court also finds that these witnesses were credible, and their testimony was consistent with one another regarding the initiation of a traffic stop around 10:13 p.m. on

February 5, 2013, the subsequent search of defendant and the other individual in the vehicle, and the search of the vehicle.

Officers Dawson, Jenkins, and Adair all testified that on the night of February 5, 2013, they were patrolling the area of 2400 North Boston Place in Tulsa in an unmarked patrol car. Dawson was driving the vehicle, Jenkins sat in the passenger seat, and Adair sat in the rear right seat.

The three officers testified that they had been frequently patrolling that particular area because it was the location of a high profile gang murder in December 2012 that had resulted in a series of retaliatory gang-related shootings. While the patrol car was facing north on North Boston Place while stopped at a stop sign at the intersection of North Boston Place and Apache Street, Officer Dawson observed a Dodge Charger driving toward him. The Charger was stopped at the intersection after traveling westbound on Apache Street and then made a left, turning south onto Boston Place toward the patrol car. Officer Dawson flashed the patrol car's spotlight to illuminate the inside of the vehicle.[2] The spotlight revealed that the driver, Jamar Stewart, and the passenger, defendant Stancle, were not wearing seatbelts. Officer Dawson immediately made a U-turn, turned his lights on, and initiated a traffic stop. The other two

---

[2] The officers testified that there is no formal Tulsa Police Department policy regarding the use of a spotlight to illuminate the inside of a moving vehicle. Officer Adair testified that, as of a few months ago, it was still an occasional practice to spotlight moving vehicles in the Organized Gang Unit. Officer Dawson testified that there was nothing about that particular vehicle that prompted him to use the spotlight. Rather, the recent events that had occurred there caused him to use the spotlight. All three officers testified that the purpose of using a spotlight in that neighborhood at that time of night during that time period was to obtain a visual of the occupants and to see if there were any traffic violations, and that they would have likely shined the spotlight at any vehicle coming toward them that night.
While Officer Dawson testified that he did not frequently flash a spotlight on moving vehicles, that night was neither the first nor the last time he did. Officer Dawson testified that his intent in flashing the spotlight was not to blind the driver. Jenkins testified that in his opinion, the illumination did not appear to blind the driver and the light only lasted for "a few seconds."

officers in the car testified that they did not personally observe the fact that defendant and Mr. Stewart were not wearing seatbelts.[3]  The vehicle stopped in the driveway of Mr. Stewart's aunt's house, approximately half a block south of the intersection.  Officer Dawson made contact with Mr. Stewart on the driver's side of the vehicle, and Officers Jenkins and Adair made contact with defendant on the passenger side.

Both Officers Dawson and Jenkins testified that as they approached the car, they detected the odor of raw marijuana emanating from the vehicle.  Officer Dawson made a hand gesture to the officers—tapping his nose—indicating to them that he smelled marijuana.  Jenkins also testified that he believed he saw a marijuana smoking device in the center console of the vehicle.[4]  Based on these observations, the officers removed both Mr. Stewart and defendant from the vehicle to perform a records check.

As defendant was exiting the vehicle, both Jenkins and Adair observed a large bulge in defendant's front right pocket.  They both testified that they believed the bulge to be a large wad of cash.  Officer Adair then informed defendant that he was being detained, and he was placed in handcuffs for officer safety.  Jenkins also noticed a partially filled bottle of Crown Royal in the car as defendant left the vehicle.  While Officers Adair and Dawson remained with the two individuals, Jenkins began to search the vehicle.

Officer Dawson testified that, at some point while Jenkins was searching the vehicle, he observed defendant chewing on something.  Based on Dawson's experience and his observation that defendant was not speaking, Dawson believed that defendant may have been chewing on contraband.  Defendant refused to open his mouth even after repeated requests from the officers.

---

[3] However, Jenkins testified that when he first approached defendant in the vehicle, he observed that defendant was not wearing his seatbelt.  The seatbelt was instead tucked behind him.
[4] The object Jenkins believed to be a smoking device was later identified as a door handle.

5

The officers attempted to open defendant's mouth, to no avail. The officers eventually gave up and instead informed defendant that he was under arrest for destroying evidence and obstructing justice.

Officer Adair began searching defendant incident to arrest and retrieved a large wad of cash from defendant's front right pocket. The officers testified that at some point shortly thereafter, defendant began running from the vehicle. Adair and Jenkins pursued defendant while Dawson remained with Mr. Stewart. Defendant, who was handcuffed, was promptly captured. Jenkins and Adair testified that they observed defendant's mouth position was different from how it was during his initial detention in that it was no longer clenched.

Other officers were notified that defendant had run from the scene and arrived to assist. Jenkins testified that it is common practice to retrace a suspect's route after a pursuit, in order to retrieve any evidence that may have been discarded or dropped by accident. Officer Todd Henley was tasked with retracing defendant's route to search for evidence, and located a plastic baggie on the ground that was covered in saliva and appeared to have been chewed on. A field test conducted by Officer Bohanon on the scene revealed that the baggie contained "crack" cocaine or cocaine base. Officer Dawson testified that the baggie was of a size that would reasonably fit in a person's mouth.

The officers resumed searching both detainees and the vehicle. The search revealed the following: $1,317 in cash belonging to defendant,[5] $471 in cash belonging to Mr. Stewart, "crack" cocaine particles in the Crown Royal bottle, two cellular phones belonging to defendant, and $334 in cash found in the center console of the vehicle. The officers testified that the

---

[5] Jenkins testified that approximately $1,100 was retrieved from defendant's front right pocket, comprised of small bills. The remaining money was found in his other pockets.

denominations of the bills found on defendant were consistent with those that would be found on an individual involved in the drug trade.

No marijuana was found on either individual or in the vehicle. The officers testified that it is common to initially detect the odor of marijuana without later finding any marijuana because its strong odor can linger even after marijuana has been removed from a vehicle. Defendant was ultimately charged with possession of narcotics. Both defendant and Mr. Stewart were later transported to the Gilcrease division.

### III.   Legal Standard

"A traffic stop is a seizure within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)); *see also Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) ("A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment."). A traffic stop is "more analogous to an investigative detention than a custodial arrest." *Id.* Thus, the analysis under *Terry v. Ohio*, 392 U.S. 1 (1968), governs. *United States v. Caro*, 248 F.3d 1240, 1244 (10th Cir. 2001).

Courts assess the reasonableness of a traffic stop under the Fourth Amendment using the following two-step inquiry from *Terry v. Ohio*: first, the district court determines "'whether the officer's action was justified at its inception,' and second 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Botero-Ospina*, 71 F.3d at 786 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). Under the first prong of *Terry*, "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic

7

violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *Id.* at 787.

The second *Terry* prong generally requires that "an investigative detention . . . 'last no longer than is necessary to effectuate the purpose of the stop.'" *United States v. Cervine*, 347 F.3d 865, 870-71 (10th Cir. 2003) (quoting *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999) (internal quotations omitted)). This is usually limited to requesting a driver's license, vehicle registration, running a computer check, and issuing a citation. *Id.* "The officer, however, may extend this detention for reasons unrelated to the traffic stop under two circumstances: (1) if the officer has 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring'; or (2) 'if the initial detention has become a consensual encounter.'" *Id.* at 871 (quoting *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994) (overruled on other grounds)).

**IV.   Analysis**

   **A. Defendant's First Motion to Suppress**

Defendant's First Motion to Suppress seeks to exclude "any and all information gleaned from the stop" on October 21, 2013 that the government intends to introduce at trial. (Doc. 1796 at 6). The government objects to the motion on the grounds that the traffic stop satisfies both requirements under *Terry*; the government argues first, that the initial traffic stop was reasonable, and second, that there was probable cause to expand the scope of the detention beyond that of a routine traffic stop. (Doc. 1813 at 5-6).

The Court reiterates its determination that the testifying officers were credible and also that the testimony of Officers Turnbough and Bohanon was consistent with one other.

### 1. First *Terry* prong

While defendant's motion disputes the fact that a traffic violation even occurred to justify the traffic stop (Doc. 1796 at 3), the Court declines to credit this argument as the uncontroverted sworn testimony of Officers Bohanon and Turnbough confirms the opposite. Further, at the hearing, defendant did not dispute that he failed to signal the turn. Thus, the Court finds that the first prong of *Terry* is unquestionably met. The car was stopped after both officers observed defendant fail to signal prior to making a right hand turn, which is a traffic violation under state law. *See Okla. Stat.* tit. 47, § 309 (failing to signal before leaving a traffic lane is a violation of the law). The law clearly indicates that an officer's observation of a traffic violation automatically justifies the initiation of a traffic stop under the Fourth Amendment. *United States v. Cervine*, 347 F.3d 865, 870 (10th Cir. 2003) ("[O]nce the Trooper observed a traffic violation, such as swerving across the lane dividing line in violation of [a state statute], the subsequent traffic stop was valid.").[6]

### 2. Second *Terry* prong

The Court likewise finds that the government has satisfied the second prong of *Terry*. In his motion and at the hearing, defendant's argument remained that the officers' failure to corroborate the marijuana smell they assert justified their search of the vehicle violates the second prong of *Terry*. (Doc. 1796 at 4-5). It is evident this is not the case.

---

[6] The fact that the officers were alerted to defendant's vehicle based on a request for assistance from a surveillance unit plays no role in the Fourth Amendment analysis. *See United States v. Cervine*, 347 F.3d 865, 870 (10th Cir. 2003) (traffic stop initiated for observed traffic violation was reasonable even where another agency informed the officers to be on the lookout for defendant, because "[t]he fact that the troopers had other motivations for stopping [the defendant] has no bearing upon [the *Terry* analysis]"); *see also Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

As stated above, a police officer may extend a detention beyond the scope of its original purpose where the officer has either obtained the detainee's consent, or where the officer has "'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring.'" *Cervine*, 347 F.3d at 871 (quoting *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994) (overruled on other grounds)). There is no dispute that defendant did not consent to the encounter. However, the Tenth Circuit has repeatedly held that an officer's detection of the smell of marijuana "alone establishes probable cause to search a vehicle for the illegal substance." *United States v. Snyder*, 793 F.3d 1241, 1244 (10th Cir. 2015); *see also United States v. Johnson*, 30 F.3d 970, 974 (10th Cir. 2010) (holding that officer's detection of "a strong odor of burnt marijuana emanating from the car" subsequent to stopping the defendant for a traffic violation constituted probable cause to search the vehicle).[7] In *Snyder*, the court held that the smell of marijuana alone provided probable cause to search the defendant's vehicle, even though the search revealed no marijuana to corroborate the officer's observation. *Snyder*, 793 F.3d at 1245. As the same facts are present here, *Snyder* is controlling.

Accordingly, the Court finds that the officers' observation of the burnt marijuana smell alone constituted probable cause to search defendant's vehicle. As the government has satisfied both prongs under *Terry*, defendant's First Motion to Suppress (Doc. 1796) is therefore **denied**.

### B. Defendant's Second Motion to Suppress

---

[7] The cases cited by defendant and the government are inapposite as both dealt with challenges to searches of a suspect's *trunk* based on an officer's detection of the odor of marijuana. *See United States v. Zabala*, 346 F.3d 1255 (10th Cir. 2003) (finding probable cause to search vehicle's trunk based on detection of marijuana coming from vehicle while conducting traffic stop); *United States v. Nielsen*, 9 F.3d 1487 (10th Cir. 1993) (no probable cause to search defendant's trunk based on detection of marijuana in the absence of corroborating evidence). The defendant has not specifically contested the search of his trunk in this case.

Defendant's Second Motion to Suppress (Doc. 1797) likewise asserts that any evidence obtained from the February 5, 2013 traffic stop should be suppressed because the officers violated defendant's Fourth Amendment rights. The government again responds that the stop satisfied the two prongs under *Terry v. Ohio*.

As was the case with the witnesses who testified regarding the October 21, 2013 traffic stop, Officers Dawson, Jenkins, Adair, and Bohanon, who testified regarding the February 5, 2013 stop, were also credible and their testimony was consistent with one another.

### 1. First *Terry* prong

Defendant does not dispute the fact that he and Mr. Stewart were not wearing seatbelts, but contests the manner in which the officers discovered the traffic violation that justified the stop. Specifically, defendant argues that Officer Dawson's act of shining a spotlight on the moving vehicle is dangerous and also amounts to a search under the Fourth Amendment. However, defendant provides no case law suggesting that a law enforcement officer's method of discovering a traffic violation leading to a traffic stop is in any way relevant to the *Terry* inquiry. Nonetheless, the Court addresses defendant's arguments.

First, defendant cites no case law in support of his argument that spotlighting a vehicle is dangerous such that it would constitute a Fourth Amendment violation. At the hearing, the officers testified that, at the time of the search, it was not uncommon for Tulsa Police Department officers to use a spotlight to illuminate areas while on patrol. The officers justified the use of the spotlight based on the unsafe nature of the neighborhood in light of recent shootings. The officers also testified that they would have shined the spotlight at any vehicle coming toward them in that particular neighborhood at that time. Dawson testified that the February 5, 2013 incident was neither the first nor the last time he used a spotlight to illuminate a

moving vehicle, and the other officers also testified that they had also used a spotlight in the same manner prior to and after this incident. Moreover, it is unclear how dangerous the use of the spotlight was, as multiple officers testified that it was brief, and while the vehicle was moving slowly, after having stopped at a stop sign. Dawson further testified that he would not have used the spotlight if he and defendant were driving on the highway.

In the absence of anything more from defendant, there is no basis upon which the Court can find that Dawson's use of a spotlight to illuminate a vehicle violates the Fourth Amendment. Defendant's argument thus fails.

Second, and in direct contrast to defendant's contention that Officer Dawson's actions constituted a search, the Tenth Circuit has held that "'the use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection.'" *United States v. Gonzalez-Acosta*, 989 F.2d 384, 387-88 (10th Cir. 1993) (quoting *Texas v. Brown,* 460 U.S. 730, 740 (1983)). There, the court held that a law enforcement officer's inspection of the undercarriage of the defendant's vehicle did not constitute a "search" within the meaning of the Fourth Amendment. *Id.* The court reasoned that a law enforcement officer may "'change his position' and 'bend down at an angle' to see what is inside a car, because 'there is no reason why an officer should be precluded from observing what would be entirely visible to him as a private citizen.'" *Id.* Thus, there is no Fourth Amendment violation based Officer Dawson's use of a spotlight, and defendant's second argument fails.

It is clear that Officer Dawson's observation of defendant and Mr. Stewart not wearing a seatbelt[8] justifies the initiation of a traffic stop, as was the case for the October 21, 2013 stop. *See Cervine*, 347 F.3d at 870. Thus, the government has met the first *Terry* prong.

### 2. Second *Terry* prong

Defendant's argument under the second *Terry* prong is identical to the argument asserted under the same prong in his First Motion to Suppress: because the officers were unable to corroborate the raw marijuana smell they assert is the reason for the stop, the detention cannot satisfy the second *Terry* prong. (Doc. 1797 at 8-10). For the reasons discussed above, this argument likewise fails.

Accordingly, because the government has satisfied both prongs of *Terry*, defendant's Second Motion to Suppress (Doc. 1797) is also **denied**.

### V. Conclusion

For the reasons set forth above, defendant's First Motion to Suppress regarding October 21, 2013 (Doc. 1796) and defendant's Second Motion to Suppress regarding February 5, 2013 (Doc. 1797) are **denied**.

**SO ORDERED** this 21st day of April, 2016.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE

---

[8] *See Okla. Stat.* tit. 47, § 47-12-417 (it is a violation of the law for the driver and front seat passenger of a vehicle to not wear a seat belt).